**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| In the Matter of the Estate of SHERRI ZAMICHIELI, A.K.A. SHERRI GUERRAZZI ZAMICHIELI, deceased. | ) ) ) ) |
| LEE VEGA, PERSONAL REPRESENTATIVE FOR THE ESTATE OF SHERRI ZAMICHIELI, | ) ) ) ) ) |
| Petitioner, | ) ) |
| v. | ) C.A. No. 2023-0292-SEM ) |
| STEPHANIE ZAMICHIELI, | ) ) |
| Respondent. | ) |

**POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Dated: April 5, 2024

1.     This final report makes post-trial findings of fact and reaches conclusions of law regarding the breach-of-fiduciary-duty claim filed by Lee Vega (the "Petitioner"), in his capacity as the successor personal representative of the estate of Sherri Zamichieli (the "Estate") against Stephanie Zamichieli (the "Respondent").[1]

---

[1] The facts in this report reflect my findings based on the record developed at trial on October 23, 2023.  *See* Docket Item ("D.I.") 19.  I grant the evidence the weight and credibility I find it deserves.  Citations to the trial transcript (D.I. 20) are in the form "Tr. #." The Petitioner's exhibits are cited as "PX __." The Respondent's exhibits are cited as "RX __."

2. The Petitioner initiated this action on March 8, 2023 through a petition seeking to hold the Respondent liable for breach of fiduciary duty to the Estate and its beneficiaries (the "Petition").[2] The Respondent served as personal representative of the Estate from July 10, 2020 through her removal on July 14, 2022.[3] The Petitioner was appointed as successor personal representative on July 27, 2022.[4]

3. The Petition alleges one count for breach of fiduciary duty. The Petitioner alleges that the Respondent breached her duties to the Decedent's estate and should be assessed damages of at least $80,000.00.[5]

---

After trial, on or about February 27, 2024, the Respondent filed a letter and exhibits with the Court. D.I. 21. Therein, the Respondent raises concerns about the Petitioner's accounting, which was filed with the Register of Wills. In particular, the Respondent notes the Petitioner's representation on the accounting that the Respondent depleted the Estate's assets is an unresolved issue, presently pending in this action. The Respondent also questions the Petitioner's alleged failure to account for two vehicles and other items in the inventory of the Estate. The Respondent ends with a request: "Please take this letter into consideration regarding the closing of the estate." D.I. 21. The Respondent's request is misplaced. I do not have jurisdiction through this action to direct or otherwise affect the closing of the Estate, pending in New Castle County Register of Wills Folio No. 175209 ("ROW"). If the Respondent wishes to have her concerns heard, the Register of Wills is the appropriate entity to contact, and the Register of Wills docket is the appropriate docket for filing. The Respondent's request is outside the scope of this action and will not be addressed any further.

[2] D.I. 1.

[3] *See id.*

[4] *Id.*

[5] *Id.*

2

4.      The Respondent answered the Petition on or around May 31, 2023, and, at the Petitioner's request, I scheduled a final evidentiary hearing (or trial) for October 23, 2023.[6] Thereafter, I took this matter under advisement.

5.      This is my final report.

**FINDINGS OF FACT**

6.      The evidence presented at trial, and that of which I take judicial notice, supports the following findings of fact.

7.      Sometime after 2017, Sherri Zamichieli (the "Decedent") was diagnosed with terminal cancer.[7] The burden of supporting her fell largely on the Respondent, who had lived with the Decedent for 20 years.[8] Such was a bit of a reversal; for many years, the Decedent supported the Respondent and the Respondent's daughter.[9] The Respondent explained that she and the Decedent raised

---

[6] D.I. 14, 19. My scheduling letter directed the parties to submit witness and exhibit lists at least one week before the trial. D.I. 14. On the day of trial, and only providing three days' notice to the Petitioner, the Respondent sought to call Alicia Lindinger as a witness. *See* Tr. 3:7–12, 4:5–8. Over the Petitioner's objection, I indicated that I would permit Ms. Lindinger to testify, but the Respondent ultimately declined to call her. *See* Tr. 6:6–11, 105:23–106:4. Thus, the only testimony was from the Petitioner and the Respondent.

[7] Tr. 49:23–24. *See* Tr. 54:22–23.

[8] *See* Tr. 49:18, 50:12. *But see* Tr. 137:13–21.

[9] Tr. 73:10–74:3.

the Respondent's daughter together.[10] During that time, the Decedent had a higher income but the Respondent contributed toward expenses if and when she could.[11]

8. The Respondent and the Decedent lived together in the Decedent's home at 134 Emerald Ridge Drive in Bear, Delaware (the "Property").[12] Their living situation was strained by the Decedent's illness and the pandemic; "[t]he house was in disarray[.]"[13] But the Decedent still found the opportunity to transfer some of her assets to her loved ones.[14] In 2019, the Respondent recalls spending the holidays with her family where they "went through everything in the basement [of the Property] and took everything they wanted."[15]

9. The Decedent passed on May 25, 2020, without a will.[16] She left behind two daughters—the Respondent and Michelle Zamichieli (the "Heir," together with

---

[10] Tr. 73:11–13.

[11] *See, e.g.*, Tr. 73:15–23. *See also* RX A.

[12] *See* PX A.

[13] Tr. 50:12–13.

[14] Tr. 49:23–50:6.

[15] Tr. 55:12–15. It was at that gathering that the Respondent recalls the oak curio cabinet being "something for [her], that [she] was supposed to take, that [she] was supposed to keep." Tr. 55:2–4, 55:18–20. That cabinet was, at the time of trial, still in the Respondent's storage unit. Tr. 55:21–24.

[16] *See* ROW D.I. 1. "Because the Register of Wills is a Clerk of the Court of Chancery, filings with the Register of Wills are subject to judicial notice." *Arot v. Lardani*, 2018 WL 5430297, at *1 n.6 (Del. Ch. Oct. 29, 2018) (citing 12 *Del. C.* § 2501; D.R.E. 202(d)(1)(C)). *See also* Tr. 14:13–15. The Decedent was described by her family in glowing terms. *See, e.g.*, Tr. 106:22–24 (expressing that the Decedent was "an absolute saint, and she deserves the recognition and she deserves for this to be over").

the Respondent, the "Daughters").[17] She also left behind the Property, personal property, and liquid assets in the bank.[18]

10. In July 2020, the Daughters jointly petitioned to serve as co-administrators of the Estate.[19] Their petition was granted, and they were issued letters of administration on July 10, 2020.[20] Through their appointment order, the Daughters were required to file an inventory of the Estate on or before October 10, 2020 and a first accounting by July 10, 2021.[21] The Daughters did not meet those deadlines.

11. The Heir has disclaimed any responsibility for the delinquencies in the Estate. On or about August 23, 2020, the Heir filed a letter with the Register of Wills, which she designated her "formal notice of resignation as a joint personal representative" of the Estate.[22] The Heir explained that she had not taken any action as co-administrator because the Respondent allegedly would not allow her to do so.[23] The Heir did not copy the Respondent on her letter, and the Respondent testified

---

[17] ROW D.I. 1.

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] ROW D.I. 9.

[23] *Id.*

5

credibly that she was unaware of the resignation.[24] The Register of Wills did not docket any response to, or acceptance or rejection of, the Heir's resignation.

12.     The Respondent admits she "did mess up with the handling of the estate, as far as not doing things in a timely manner."[25] She testified that the grief and stress from a flood in the Property, delayed insurance recovery, and the loss of her personal storage unit caused her to break down; her "whole life fell apart."[26]

13.     The Respondent testified that she initially had trouble accessing the Decedent's bank account(s).[27] When she secured access beginning in December 2021, "there was maybe a little over [$]6,000, close to $7,000."[28] The Respondent then opened an estate account with Bank of America (the "Estate Account") and transferred $9,608.69 to the Estate Account, from the Decedent's prior accounts, between December 2021 and April 2022.[29] During that same time, the Respondent

---

[24] *See, e.g.*, Tr. 69:7–14 ("And as far as that letter, I never received that. . . . I don't understand how not sharing with me that you're not going to do it anymore is not required. . . . [B]ecause I was still reaching out to the Register of Wills in October of 2021, asking what my sister has submitted."). The Petitioner testified that the Register of Wills told the Heir that she did not need to notify the Respondent on her resignation and that the letter resignation was sufficient as is. *See, e.g.*, Tr. 116:9–21. I give this testimony no weight.

[25] Tr. 51:20–22.

[26] Tr. 50:21–51:19.

[27] Tr. 51:23–52:1. She also testified that the Petitioner and the Heir had the Decedent's vehicles in their possession when the Decedent passed. Tr. 52:1–4.

[28] Tr. 52:5–7, 130:12–13.

[29] *See* PX O.

expended, transferred, or withdrew $9,566.48 from the Estate Account.[30] The Respondent admitted that she used money in the Estate Account to pay off her personal credit cards, which she had been using to pay for the Property and its upkeep.[31]

14. While the Respondent was freely using the Estate Account, the mortgage on the Property went unpaid and the Property went into foreclosure.[32] The mortgagee initiated foreclosure proceedings on May 27, 2022 in the Superior Court.[33] The Respondent was served with the Superior Court complaint but failed to respond or participate in mandatory mediation.[34]

15. After the foreclosure action was filed, on May 31, 2022, the Register of Wills issued a rule to show cause directed solely to the Respondent, directing her to

---

[30] PX 0.

[31] Tr. 52:7–11. The statement for the Estate Account reflects substantial cash withdrawals, payments to credit card companies, and payments to Verizon Wireless. PX O. The Respondent testified and pointed to documentation purportedly showing that the money went toward repairs to the Property. Tr. 52:12–14, 87:20–93:3; RX F. With monthly maintenance fees, the Estate Account was down to $2.80 by August 15, 2022. PX O.

[32] *See Rocket Mortg. v. Est. of Zamichieli*, C.A. No. N22L-05-071 AML (Del. Super.) ("Super."). I take judicial notice of filings in this related proceeding. *See* D.R.E. 202(d)(1)(C). *See also* Tr. 18:23–24.

[33] Super. D.I. 1.

[34] *See* Super. D.I. 2, 3, 8.

7

appear at a hearing and explain why she failed to file an accounting for the Estate (the "RTSC Hearing").[35]

16. I presided over the RTSC Hearing on July 14, 2022 at which the Respondent failed to appear. I issued an order removing the Respondent as administrator and assessed fees against her (the "Removal Order").[36] In the Removal Order, I clarified that the Respondent remained "answerable to this Court for all acts done as personal representative[] of th[e] [E]state that ought not to have been done and for all acts not done that ought to have been done" and declared the Respondent was "not discharged from liability therefor."[37] I further permitted any interested party to petition for their appointment as successor administrator and directed that the Respondent "shall deliver to said successor administrator all of the unadministered effects of [the Decedent], including books and papers," to such successor within 10 days of their appointment.[38]

17. On or around July 26, 2022, the Petitioner, who is the Heir's husband, petitioned the Register of Wills for his appointment as successor administrator.[39]

---

[35] ROW D.I. 10.

[36] ROW D.I. 11.

[37] *Id.*

[38] *Id.*

[39] ROW D.I. 13.

8

The Petitioner was appointed on July 27, 2022 and directed to file an inventory on or before October 27, 2022 and an accounting by July 27, 2023.[40]

18.    After his appointment, the Petitioner attempted to intervene in foreclosure proceedings.[41] On September 16, 2022, the Petitioner, in his capacity as successor administrator of the Estate, filed a petition to sell the Property to pay debts of the Estate, which was assigned Civil Action Number 2022-0829-SEM (the "Sale Action").[42] After denying the Petitioner's motion to expedite, I issued a rule to show cause to the Daughters directing them to respond to the petition or appear at a hearing to consent to, or oppose, the relief sought.[43] The Daughters did not appear at the October 25, 2022 hearing and, finding the statutory requirements met, I granted the petition to sell in part.[44] I confirmed and expanded on my oral ruling in an October 26, 2022 order (the "Sale Order").[45] In the Sale Order, I authorized the Petitioner to

---

[40] ROW D.I. 12. The Petitioner filed an inventory on or around September 20, 2022 and an accounting on or around January 25, 2024. ROW D.I. 16, 20. *See also* ROW D.I. 17 (granting the Petitioner an extension to file the accounting).

[41] *See* ROW D.I. 15; Super. D.I. 9. The Respondent testified that by the time the Petitioner visited the Property in connection with a sale, "it was in better condition than it was before [the Decedent] died." Tr. 52:20–23. She credits herself for the improvements, including her installation of a new drop ceiling. *See* Tr. 52:12–14.

[42] *In re Zamichieli*, C.A. No. 2022-0829-SEM ("Sale Action"). I take judicial notice of the filings in this related action under D.R.E. 202(d)(1)(C).

[43] Sale Action D.I. 12, 13, 15.

[44] *See* Sale Action D.I. 22.

[45] Sale Action D.I. 19.

9

list the Property for sale and enter into an agreement of sale subject to the Court's approval.[46] To facilitate the sale, I ordered the Respondent to vacate the Property within 14 days.[47] When the Respondent did not voluntarily vacate, I authorized a writ of ejectment and possession.[48] The Respondent was ejected from the Property on December 1, 2022.[49]

19.     On December 16, 2022, I granted the Petitioner's request to sell the Property to third party purchasers for $509,000.00.[50] The sale closed on December 22, 2022, and on February 16, 2023, I approved the Petitioner's return of sale, which reflected proceeds to the Estate of $80,174.23, and closed the Sale Action.[51]

20.     The Petitioner initiated this action less than one month later, on March 8, 2023.[52]

---

[46] *Id.*

[47] *Id.*

[48] Sale Action D.I. 23.

[49] *See* Sale Action D.I. 27. How the Respondent left the Property is disputed. The Respondent testified that the ejection came at a difficult time in her life. Tr. 59:11–15, 129:9–12. But she contends she went to great lengths to prepare the house for sale and clear it out. Tr. 58:4–7. The Petitioner disputes as much. Tr. 122:17–20.

[50] Sale Action D.I. 30.

[51] *See* Sale Action D.I. 32, 35.

[52] D.I. 1. The relevant procedural posture of this action has already been addressed above.

## CONCLUSIONS OF LAW

21. The Petitioner pled one claim—breach of fiduciary duty. There is no reasonable dispute whether the Respondent owed fiduciary duties to the Estate and its beneficiaries while she served as the personal representative—she did. Nor is there any dispute that the Petitioner, as the successor personal representative, has standing to assert a breach-of-fiduciary-duty claim on behalf of the Estate. Thus, I limit my inquiry to two issues: (1) breach and (2) damages. I also address the Respondent's unclean hands defense.

22. In addressing these two primary issues, I hold the Petitioner to his burden of proof, which is by a preponderance of the evidence.[53] "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not."[54] The Respondent bears the same burden for her unclean hands defense.[55]

---

[53] *Heller v. Kiernan*, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002), *aff'd*, 806 A.2d 164 (Del. 2002)

[54] *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002) (citations and quotation marks omitted).

[55] *Niehenke v. Right O Way Transp., Inc.*, 1996 WL 74724, at *2 (Del. Ch. Feb. 13, 1996) ("Defendants bear the burden of pleading and proving 'unclean hands' as an affirmative defense.").

## I.    The Respondent breached her duties to the Estate and its beneficiaries.

23.    Generally, administrators of a Delaware estate are "responsible for compiling the inventory of [the] Decedent's estate, managing the Decedent's assets, and paying the Decedent's debts."[56] Administrators are "required to use good judgment in the administration of the estate . . . and to act in all ways with good faith. An executor is not an insurer of assets which come into his hands but he is required to use ordinary care, prudence, skill and diligence[.]"[57] "The administrator, like a trustee, must 'deal fairly with the beneficiaries' and cannot place her interests 'ahead of the interests of the Trust and its other beneficiaries.'"[58]

24.    Through the Petition, the Petitioner averred the Respondent breached her duties to the Decedent's estate in six (6) ways: (1) refusing to maintain and promptly sell the Property; (2) using the Estate Account for personal gain; (3) auctioning or selling personal property of the Estate and failing to provide the proceeds to the estate; (4) abandoning property of the Estate; (5) accruing debt on the Decedent's credit card(s); and (6) hiding her conduct and withholding and refusing to turn over Estate assets to the Petitioner as successor administrator. At the hearing, the Petitioner further requested judgment against the Respondent, solely,

---

[56] *Dixon v. Joyner*, 2014 WL 3495904, at *3 (Del. Ch. July 14, 2014).

[57] *Del. Tr. Co. v. McCune*, 80 A.2d 507, 511 (Del. Ch. 1951).

[58] *Thomas & Agnes Carvel Found. v. Carvel*, 2008 WL 4482703, at *10 (Del. Ch. Sept. 30, 2008), *aff'd*, 970 A.2d 256 (Del. 2009).

for certain expenses, costs, and fees incurred by the Estate. I address each request in turn.[59]

### (a) The Respondent did not breach her duties in connection with the Property.

25. Under Delaware law, the Property passed at the Decedent's death to the Daughters.[60] Upon its passing, the Daughters, as joint owners thereof, bore joint and equal responsibility for maintaining the Property and its expenses.[61] That responsibility was not borne from their role as then-co-administrators of the Estate, because, again, the Property passed outside the Estate.

26. Through the Sale Action, I issued an order divesting the Daughters of their ownership in favor of the Estate, finding that the statutory requisites for a sale to pay debts of the Estate were met. I further authorized a writ of ejectment against the Respondent as incident to the sale. But that action does nothing to convert or alter the Respondent's duties vis-à-vis the Property. The Petitioner has failed to

---

[59] The Petitioner also raised concerns about insurance claims purportedly paid to the Respondent to assist with repairs to the Property. Tr. 8:16–19. Because the Petitioner has not articulated what relief, if any, he seeks regarding those insurance payouts, I cannot address them any further.

[60] *In re Wiggins*, 2022 WL 1022712, at *4 (Del. Ch. Mar. 29, 2022) (citations omitted).

[61] The Petitioner conceded as much at the hearing. Tr. 7:22–24 ("And the property then became the joint responsibility of the heirs, [the Respondent] and [the Heir].").

demonstrate that the Respondent owed the Estate any cognizable duty regarding maintaining the Property.[62]

27.     Further, the Petitioner has failed to demonstrate that the Respondent affirmatively breached her duties to the Estate and its beneficiaries by failing to petition for a sale of the Property to pay debts of the Estate.[63] The Petitioner has not demonstrated that the condition of the Estate, while the Respondent was fiduciary, was such that failing to petition to sell the Property to pay the Estate's debts was outside a good faith administration or otherwise not an exercise of ordinary care, prudence, skill, and diligence.[64]

---

[62] The Petitioner argues that the Respondent failed to properly respond to the foreclosure action and improperly continued to live in the Property without paying the mortgage. Tr. 18:10–12. But I find no basis on which I can, or should, convert the Respondent's delinquencies as a co-owner of the Property, which passed outside the Estate, into breaches of her duties to the Estate. Either of the Daughters could have assumed the mortgage to protect their interests in the Property. It would be inappropriate on the record before me to transform the Respondent's failure to do so into a breach of her duty to the Estate and its beneficiaries. The same is true for the unpaid household expenses, like the Delmarva and sewer bills; I find no breach of estate-related duties in those delinquencies. *See* RX I; PX K–L.

[63] Although the Respondent remarked, nonchalantly, at the hearing that "[t]here was no estate assets to pay anything until the home was sold[,]" (Tr. 47:11–12), the record reflects otherwise. *See* PX O.

[64] *See also* 12 *Del. C.* § 2702 (establishing a process through which creditors of an estate can compel an administrator to petition to sell real property to pay unpaid debts; a process that was not invoked by the creditors of the Estate).

The Petitioner hints at a conflict of interest, with the Respondent both serving as administrator of the Estate and residing in, and co-owning, the Property. But those dual interests would not present a conflict unless or until it becomes clear that the Estate would need to sell the Property to pay its outstanding debts, lets there be a detriment to the

**(b) The Respondent breached her duties in depleting the Estate Account.**

28. The Respondent admittedly used the Estate Account for her personal needs. The Estate Account records confirm as much, and I find the Petitioner has met his burden to prove that the Respondent breached her duties to the Estate by withdrawing or otherwise expending $9,566.48 from the Estate Account. These withdrawals were made for the Respondent's benefit, to the detriment of the Estate, which had outstanding debts, and to the exclusion of the other beneficiary, the Heir.[65]

**(c) The Respondent did not breach her duties through the sale or auction of personal property but did improperly retain certain items.**

29. The Petitioner argues that the Respondent auctioned or sold personal property that should have passed through the Estate. But the Petitioner admits that he has "no way . . . to prove that [those] were estate items" other than his own understandings from his relationship with the Decedent and personal visits to the Property.[66] The issue is further muddied by the reality that the Decedent and the Respondent cohabitated in the Property for 20 years. Parsing who owned what piece of furniture, particularly in shared living spaces, is difficult. Holding the Petitioner

---

beneficiaries of the Estate. The Petitioner bore the burden of proving that that need became clear before the Respondent was removed. He failed to meet that burden.

[65] *See* ROW D.I. 11.

[66] Tr. 38:10–15.

to his burden to prove, by a preponderance of the evidence, that the challenged items were solely the Decedent's property and were improperly auctioned or sold by the Respondent, I find he has failed.[67]

30.     But the Respondent did admit to retaining, in her storage unit, some of the Decedent's personal property, which should pass through the Estate. That property consists of: (1) an antique rolltop table, (2) a jade tea set, (3) several Madame Alexander dolls, (4) the Decedent's adjustable sleep bed frame, and (5) Bessie Pease Gutmann prints and plate.[68] Retaining this personal property was inappropriate and in breach of either the Respondent's fiduciary duties to the Estate and its beneficiaries or the Removal Order, which directed the Respondent to transfer all property of the Estate to the successor administrator, the Petitioner.[69]

---

[67] Rather, the evidence supports that many of these items were likely jointly owned by the Decedent and the Respondent. *See* Tr. 54:1–9.

[68] The Petitioner recalled three prints, while the Respondent recalled five. *Compare* PX P *with* Tr. 63:23–64:3. However many there are, they should not have been retained by the Respondent.

My list of items excludes numerous items on the Petitioner's list, for which I find the Petitioner did not meet his burden to prove, by a preponderance of the evidence, either their existence, their sole ownership by the Decedent, or their improper disposition or retention by the Respondent. *See* PX P. Specifically, the Petitioner's documentation of a garage sale and social media postings regarding personal property sales, are insufficient to prove the items were assets of the Estate and improperly disposed of or sold by the Respondent. PX Q.

[69] The Respondent attempts to shift the focus to the Petitioner, the Heir, and other family members who, allegedly, also took items from the Property both before and after the Decedent's death. *See, e.g.*, Tr. 67:20–68:4. ("There was a piano stool that my aunt took when she went through everything in the estate, and there was a sewing chest, and my aunt

### (d) The Respondent did not breach her duties in abandoning property.

31. The Petitioner argues that the Respondent abandoned property of the Estate, which was destroyed resulting in a loss to the Estate. The Respondent admitted that she left at least two dressers in the Property when she left.[70] But it is difficult to understand the Petitioner's cry of abandonment under these circumstances. It was the Petitioner who, after the Respondent was ejected from the Property, removed the remaining personal items from the Property.[71] Further, the alleged abandonment happened after the Respondent was removed from her role as fiduciary of the Estate and could be viewed as a relinquishment in favor of the successor administrator, a requirement of the Removal Order. On this record, I cannot find that the Respondent breached her duties by leaving personal items behind in the Property.

---

took that."); Tr. 50:1–4 ("[The Heir] and [the Petitioner] had my mom – my aunt empty a empty a safety deposit box that was my mother's that contained a $25,000 ring and a watch. Now [the Heir] left with that ring[.]"). The conduct of those parties is not before me and does nothing to minimize or excuse the Respondent's breach of her duties.

[70] Tr. 67:15–18. She also left property in the garage. Tr. 64:1–7, 109:22–23, 122:15–16.

[71] *See* PX S–T (reflecting a payment by the Petitioner, on behalf of the Estate, for cleaning of and junk removal from the Property, respectively).

17

**(e)** **The Respondent breached her duties by failing to pay the Decedent's credit card debt.**

32. The Petitioner seeks to hold the Respondent responsible for charges the Respondent made to the Decedent's credit card before the Decedent passed. But charges made before the Respondent's appointment as co-administrator of the Decedent's estate cannot be breaches of her then-nonexistent duties to the Estate or its beneficiaries.[72] Nor am I willing to use my forgiving eyes, to transform the Petitioner's stated claim into a proper pre-death inquiry because (1) the Petitioner has failed to demonstrate that the Decedent lacked capacity at the time of the transactions or (2) was unduly influenced to permit the credit card access and use.[73]

---

[72] The Petitioner conceded that he could make no such argument. Tr. 44:16–20 ("Is that part of the argument you're making, that she had some sort of duty before the decedent passed away to not make these purchases? THE PETITIONER: No."). *See also* Tr. 46:22–47:2 ("I am not going to address an argument that you made charges before death that were not appropriate. That's outside the scope of this complaint, which was breach of fiduciary duties owed to the [E]state and the beneficiaries.")

[73] The Petitioner is proceeding as a self-represented party and, as such, is entitled to forgiving eyes that look beyond legal formalities and into the true nature of his dispute. *See In re Elad*, 2024 WL 358888, at *3 n.16 (Del. Jan. 30, 2024) (explaining that it afforded the self-represented party "leniency in presenting his claims . . . and [as such] reviewed his various filings to discern the substance and decide the merits of his claims"). Arguably, this leniency would support looking beyond the Petitioner's labeling of his sole claim as one for breach of fiduciary duty and considering alternative requests for relief, which may include a challenge to the transactions for lack of capacity or undue influence. But capacity is presumed, and the Petitioner failed to overcome that presumption. *See Bettis v. Premier Pool & Prop. Mgmt., LLC*, 2012 WL 4662225, at *2 (Del. Ch. Sept. 26, 2012) ("Under Delaware law, '[a]dults are presumed to have contractual capacity and the burden of proving otherwise rests with the party alleging incapacity.'") (citation omitted) Further, demonstrating undue influence sufficient to unwind a transaction is no easy feat. *See, e.g., In re Barker Tr. Agreement*, 2007 WL 1800645, at *5 n.7 (Del. Ch. June 13, 2007)

18

Yet the Petitioner did argue, alternatively, that the Respondent's failure to ensure the debts were promptly paid before her removal as administrator of the Estate amounts to a breach. This argument is persuasive and supported by the record.[74]

### (f) The Respondent may have violated the Removal Order, but not to a sanctionable level.

33. The Petitioner argues that the Respondent failed to cooperate in the transition of administration of the Estate. Although couched under a claim for breach of fiduciary duty, this is really an argument that the Respondent failed to comply with the Removal Order. I have already addressed above that the failure to return certain personal property was in violation of the Removal Order. The Petitioner avers additional violations and points to email communications. The parties' communications are undoubtedly hostile and the Respondent's communications, in particular, are unbecoming. But the Petitioner has failed to identify anything beyond the items of personal property addressed above that was not provided or otherwise made available to him after the Respondent's removal. I find the Petitioner has not

---

(addressing the "high hurdles of showing undue influence"). The Petitioner's presentation falls far short of the evidence that would be required to hold the Respondent liable for the credit card transactions under either of these theories.

[74] In 2020, statements of claims were filed for debts owed on the Decedent's credit cards and the Respondent, despite having access to the Decedent's accounts at least by 2021, failed to pay those debts. *See* ROW D.I. 3–5, 7.

met his burden to prove the Respondent knowingly failed to comply such that her conduct should be included in the surcharge consideration.

### (g) The Petitioner has failed to prove that expenses should be shifted.

34. The Petitioner asks that three (3) categories of expenses be shifted to the Respondent: (1) inspection expenses; (2) improvements to the Property; and (3) filing fees and costs. I address each in turn.

35. The Petitioner seeks to hold the Respondent solely responsible for the services of Triton Services, who the Petitioner hired to check the Property after the Respondent complained of a gas leak.[75] Because the company found no leak, or trace of a prior leak, the Petitioner asks that this expense be borne solely by the Respondent. The record remains unclear regarding the alleged leak and, finding the evidence in equipoise, this expense should be borne by the Estate.

36. The Petitioner also seeks to shift expenses for improving the Property before the sale, including the purchase of new locks and new garage door openers.[76] The Petitioner has failed to demonstrate why the Respondent should be solely charged for this expense, which is properly borne by the Estate.

---

[75] Tr. 40:14–24. *See also* PX U.

[76] Tr. 43:6–8; PX W.

37. The Petitioner also seeks to shift the cost of filing and prosecuting this action to the Respondent.[77] Under Court of Chancery Rule 54(d), "costs shall be allowed as of course to the prevailing party unless the Court otherwise directs." "Under Rule 54(d), the 'prevailing' party is a party who successfully prevails on the merits of the main issue or the party who prevailed on most of their claims."[78] The Petitioner has prevailed on some, but not all his claims. As the below calculation reflects, the appropriate surcharge is far less than the more than $80,000.00 the Petitioner sought. The Petitioner has not prevailed on most of his claims and, as such, is not the prevailing party; costs should not be shifted.

## II. The personal property should be returned, and the Respondent should be surcharged.

38. When an administrator breaches their duties to the Estate and its beneficiaries and there is a resulting loss to the Estate because of those breaches, the administrator will be subjected to a surcharge.[79] "A surcharge is, essentially, a sanction against a personal representative requiring the personal representative to fund (or refund) the estate because the personal representative improperly or poorly

---

[77] *See* PX V, W.

[78] *In re Mindbody, Inc., S'holder Litig.*, 2023 WL 2518149, at *48 (Del. Ch. Mar. 15, 2023) (citation omitted).

[79] *Del. Tr. Co. v. McCune*, 80 A.2d at 511. The Petitioner clarified that he is not seeking a monetary judgment above the Respondent's share of the Estate, but rather to surcharge her share. Tr. 127:16–128:3.

handled the estate, engaged in self-dealing, or improperly depleted estate assets. . . . [S]urcharges are normally tailored to remedy the specific harm caused, rather than to punish the personal representative."[80]

39. The Respondent breached her duties to the Estate and its beneficiaries by withdrawing or otherwise expending $9,566.48 from the Estate Account, while at the same time failing to address the Decedent's credit card debts. The Respondent also improperly retained the following personal property: (1) an antique rolltop table, (2) a jade tea set, (3) several Madame Alexander dolls, (4) the Decedent's adjustable sleep bed frame, and (5) Bessie Pease Gutmann prints and plate.

40. The Respondent's share of the Estate should be surcharged in the amount of $4,783.24, which should, instead, be credited to the Heir's share. This properly accounts for the harm in the Respondent's use of the Estate Account to the exclusion of the Heir, while acknowledging the Respondent's 50% interest in the Estate.

41. The Petitioner requests a further surcharge for the retained personal property.[81] But the more equitable remedy is injunctive relief. Unless the parties can agree to a physical division/allocation, the Respondent shall return the above-

---

[80] *In re Clark*, 2019 WL 3022904, at *7 (Del. Ch. July 9, 2019).

[81] The Petitioner attempted to value the retained personal property through internet research and rough math. *See, e.g.*, Tr. 118:3–119:1; PX P. The Petitioner asks that I use those values to surcharge the Respondent. I find such would be speculative and inequitable.

identified personal property to the Estate, care of the Petitioner, for the Petitioner to liquidate for the benefit of the Estate.

42. The final breach, regarding the Respondent's failure to pay the Decedent's credit card debt, does not support any increase to the above surcharge. The Petitioner has failed to demonstrate how the Respondent's failure to address those claims has harmed the Estate in any cognizable or calculable way.

## III. The Respondent failed to prove her defense of unclean hands.

43. Sitting as a judicial officer on a court of equity, I would be remiss not to address the Respondent's allegations that the Petitioner is treating her unfairly, in favor of the other beneficiary, the Heir, the Petitioner's wife.[82] The Respondent's argument, heard with forgiving ears, amounts to a defense of unclean hands.

44. The doctrine of unclean hands "applies the maxim of equity that '[h]e who comes into equity must come with clean hands.'"[83] I agree with the Respondent that the Petitioner's hands appear less than clean. The Petitioners claims amount to overreaching. And the Petitioner's quest for a surcharge in the approximate amount of the proceeds from the sale of the Property was suspect and ultimately proved largely unsupported. And it is not unreasonable for the Respondent to question the

---

[82] *See, e.g.*, Tr. 104:12–15.

[83] *Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 484 (Del. Ch. 2022), *judgment entered*, 2022 WL 17988714 (Del. Ch. Dec. 28, 2022) (citation omitted).

Petitioner's refusal to acknowledge the role of the Heir in the delinquencies in the prior administration.

45.     But "the doctrine of unclean hands does not affect all 'sinners' and does not comprehend all 'moral infirmities[.]'"[84] "The question raised by a plea of unclean hands is whether the [Petitioner's] conduct is so offensive to the integrity of the court that his claims should be denied, regardless of their merit."[85] Here, the answer to that question is "no." The Petitioner has proven (to the limited extent above) that the Respondent breached her duties to the Estate and its beneficiaries and that a limited surcharge is warranted. That surcharge will benefit the Estate, which should not suffer due to potentially self-interested motivations. Further, the Petitioner displayed a firmly held belief that the Heir properly and effectively resigned before taking any action on behalf of the Estate, thus his failure to pursue her is understandable.[86] And the Respondent has not introduced any evidence

---

[84] 27A Am. Jur. 2d *Equity* § 21 (footnote omitted), Westlaw (database updated Feb. 2024).

[85] *Gallagher v. Holcomb & Salter*, 1991 WL 158969, at *4 (Del. Ch. Aug. 16, 1991), *aff'd sub nom. New Castle Ins., Ltd. v. Gallagher*, 692 A.2d 414 (Del. 1997) (TABLE).

[86] I do not share the Petitioner's certainty and find no clear documentation that the resignation was accepted by the Register of Wills. But, by the time the Register of Wills issued the rule to show cause notice, the Register of Wills was treating the Respondent as the sole administrator (ROW D.I. 10) and my Removal Order confirmed that the Heir was no longer a fiduciary to the Estate. ROW D.I. 11.

showing the Heir did, in fact, act on the Estate's behalf.[87] Thus, I find the Respondent has failed to demonstrate that unclean hands bars the Petitioner from securing relief on behalf of the Estate.

\* \* \*

46. For the foregoing reasons, (1) the Respondent's share of the Estate should be surcharged in the amount of $4,783.24, which should, instead, be credited to the Heir's share and (2) the identified personal property should be returned to the Estate unless the parties can agree otherwise. The remaining requests for relief should be denied and the Estate should proceed to closing, with the payment of all remaining outstanding debts and expenses and distribution to the Daughters.

47. This is a final report under Court of Chancery Rules 143 and 144. Exceptions may be taken within eleven days of the date hereof.[88]

/s/ Selena E. Molina
Magistrate Selena E. Molina

---

[87] The closest she comes is with her allegations that the Heir and the Petitioner retained the Decedent's vehicles. Tr. 69:14–15. But the Respondent's allegations alone, without additional proof or requests for relief, fail to convince me that unclean hands applies.

[88] *See* Ct. Ch. R. 144(d)(1) ("In actions that are not summary in nature or in which the Court has not ordered expedited proceedings, any party taking exception shall file a notice of exceptions within eleven days of the date of the report.").